Freedom Newspapers, Inc., a corporation v. Commissioner.
Freedom Newspapers, Inc. v. Commissioner
Docket No. 2048-63.
United States Tax Court
T.C. Memo 1965-248; 1965 Tax Ct. Memo LEXIS 83; 24 T.C.M. (CCH) 1327; T.C.M. (RIA) 65248; September 15, 1965
Dana Latham and Henry C. Diehl, for the petitioner. Michael P. McLeod, for the respondent. FAY
Memorandum Findings of Fact and Opinion FAY, Judge: Respondent determined deficiencies in petitioner's income tax as follows: Taxable Year
Deficiency
1959
$351,338.57
1960
364,170.20
The sole issue for decision is whether petitioner is subject to tax under section 531[1] with respect to all or part of any earnings retained *85 by it during any of the years involved herein. Findings of Fact Some of the facts have been stipulated, and the stipulation of facts, together with the exhibits attached thereto, is incorporated herein by this reference. Freedom Newspapers, Inc. (hereinafter referred to as the petitioner), is a corporation organized under the laws of the State of California. Petitioner maintains its books of account and files its Federal income tax returns on an accrual method of accounting and on the calendar year. It timely filed its Federal income tax returns for the calendar years 1959 and 1960 with the district director of internal revenue at Los Angeles, California. Petitioner is engaged in the business of publishing newspapers in various parts of the country, with its principal office in Santa Ana, California. In fact, as of the time of the trial herein, it was the tenth largest newspaper group in the United States, publishing a total of 12 newspapers. Petitioner's Early History and Background Prior to March 31, 1950, petitioner was named Register Publishing Company, *86 Ltd. Its name was changed to Freedom Newspapers, Inc., on that date when it became the surviving corporation in a statutory merger with Appeal-Democrat Company, a California corporation; Gazette Telegraph Company, a Colorado corporation; and Crawford County Printing & Publishing Co., an Ohio corporation. All of the stock of each of the corporations was owned by the R. C. Hoiles family. Immediately upon the completion of the merger, petitioner published the following daily newspapers; Santa Ana Register at Santa Ana, California; Appeal-Democrat at Marysville, California; Gazette Telegraph at Colorado Springs, Colorado; and Telegraph Forum at Bucyrus, Ohio. In addition, petitioner owned a 64.4 percent interest in a partnership known as Odessa American, which published the Odessa American at Odessa, Texas. The Hoiles family has been in the newspaper business for a great number of years. R. C. Hoiles (hereinafter referred to as Hoiles), the president of petitioner, has been so engaged since 1898. His son, Clarence H. Hoiles (hereinafter referred to as Clarence), a vice-president, secretary, general manager, and director of petitioner, has been engaged in the newspaper business all *87 of his adult life. In 1927 the Hoiles family acquired the stock of the first of petitioner's predecessor corporations, Crawford County Printing & Publishing Co. (hereinafter referred to as Crawford), which published the Telegraph Forum in Bucyrus, Ohio. In that same year, Hoiles became president of Crawford, and Clarence became the newspaper's general manager. Hoiles, in general, has been responsible for the editorial policies of the various newspapers, including those of petitioner, whereas Clarence has been charged with the general business operations thereof. On September 6, 1945, Hoiles, on behalf of Crawford, began negotiations looking to the acquisition of an interest in the Gazette Telegraph Company, which published a daily newspaper in Colorado Springs, Colorado. The acquisition of a minority interest in Gazette Telegraph was completed on January 10, 1946. The balance of the stock of the Gazette Telegraph was acquired by members of the Hoiles family. On December 17, 1945, negotiations were begun on behalf of Crawford and others to acquire the stock of a company publishing a newspaper in Marysville, California, known as the Marysville Appeal-Democrat. Said purchase was *88 completed on February 28, 1946. Crawford acquired a minority interest in that transaction but the Hoiles family owned the remainder of the stock of the foregoing company. In March 1946 Crawford sold a portion of its securities in order to secure funds with which to complete the purchase of its interest in said paper. Early in 1948 negotiations were begun on behalf of Crawford for the acquisition of the stock of a company publishing a newspaper in Odessa, Texas, called the Odessa American. In July 1948 the purchase was completed. Subsequent to this acquisition, Crawford caused said corporation to be dissolved and formed a partnership known as Odessa America. Crawford, as a general partner, acquired a 64 percent interest in said partnership. The balance of the ownership, except for a small portion held by the Hoiles family, was allocated to key employees of the various newspapers heretofore mentioned (the Telegraph Forum, Bucyrus, Ohio, published by Crawford; the Santa Ana Register, Santa Ana, California; the Gazette Telegraph, Colorado Springs, Colorado; and the Appeal-Democrat, Marysville, California). Crawford's initial capital outlay in Odessa American amounted to $320,000. *89 In order to raise these funds, Crawford sold almost all of its so-called nonrelated securities. In addition, it was required to borrow almost $200,000. As heretofore noted, the various corporations were merged on March 31, 1950, with the Santa Ana Register (Register Publishing Company, Ltd.), petitioner being the surviving corporation. Petitioner's Growth and Expansion Since the Merger in 1950 On November 1, 1951, petitioner participated in the purchase of three newspapers: the Valley Morning Star, the Valley Evening Monitor, and the Brownsville Herald, published in Harlington, McAllen, and Brownsville, Texas, respectively. These said newspapers are operated through a partnership known as Freedom Newspapers, but commonly referred to as the Valley Partnership (hereinafter referred to as Valley). Petitioner acquired a 78.675 percent interest in Valley at a cost of $1,494,825. The remaining partners were members of the Hoiles family and employees of the various newspapers. As of September 30, 1963, after certain transfers of partnership interest, petitioner's interest in Valley had increased to 80 percent at a total cost of $1,570,081.23. On February 29, 1956, petitioner participated *90 in the purchase of the Lima News (hereinafter referred to as the News), a newspaper published in Lima, Ohio, and operated by a partnership known as the Lima News. Petitioner acquired a 58.975 percent interest in the partnership at a cost of $1,297,450. The remaining partners were members of the Hoiles family and employees of petitioner. As of December 31, 1963, after acquisition of additional partnership interests, petitioner's interest had increased to 78.20 percent at a total cost of $1,710,862.50. Petitioner liquidated most of its so-called unrelated securities in order to raise the amount needed to purchase the interest in the Lima News partnership. On June 22, 1962, petitioner purchased the stock of the Anaheim Bulletin Publishing Co., publisher of the Anaheim Bulletin, at Anaheim, California. The corporation was liquidated on January 3, 1963, and the newspaper is now operated by petitioner. The total obligation incurred by petitioner was $2,500,000, including $1,900,000 for the stock, $500,000 for a covenant not to compete, and a broker's fee of $100,000. Petitioner was willing to pay the full amount in cash, but an installment transaction was adopted to accommodate the owners. *91 Petitioner paid $580,000 in cash, with the balance due in sixty quarterly installments. On July 17, 1963, petitioner purchased the assets of La Habra Publishing Co., publisher of the La Habra Star, and owner of 100 percent of The Brea Progress, Inc., publisher of The Brea Progress, located in La Habra and Brea, Orange County, California, respectively. The purchase price of these two newspapers was $542,980, including the broker's fee and a convenant not to compete. On September 10, 1964, petitioner acquired the assets of Coachella Valley Publishing Co., which were related to the publication of Orange Daily News and Anaheim Gazette, located in Orange and Anaheim, Orange County, California, respectively. The price paid by petitioner was $200,000 cash and the assumption of a $9,000 liability. Petitioner's Business Needs During the Years in Issue A. Expansion From the acquisition of Crawford in 1927, Hoiles and Clarence, as president and general manager, respectively, of petitioner and its merged predecessors, have been committed to a fixed policy of expansion of activities in the newspaper field and have deemed acquisition of interests in other newspapers as the necessary basis *92 for such expansion. Factors dictating petitioner's acquisition policy are as follows: (1) Since there can only be nominal internal expansion once a newspaper in a given locality has acquired all the subscribers reasonably available in that locality, the only possibility for further expansion is through the acquisition of other newspapers, or interests therein, published in other localities. This principle is applicable to petitioner. (2) Young, competent executives employed by petitioner had to be given greater responsibility and opportunity for advancement or they would be lost to competing newspapers. Purchases of additional newspapers enabled petitioner to quickly move lower level executives into more desirable positions due to the fact that petitioner almost never "bought" management. (3) In addition, the trend toward large newspaper chain operations threatened the independent existence of petitioner. Unless petitioner could maintain its relative position with other chains by acquiring additional papers, it might lose ground to competing chains with loss of profits and prestige. (4) Hoiles and Clarence have had definite and fixed ideas with respect to the functions of Government *93 and the part Government should play in the lives of citizens and in the conduct of business. They have always believed the daily newspaper to be the best possible medium through which the public can be acquainted with these basic concepts. They have likewise always thought that newspapers should maintain complete independence and never be subservient to large advertisers or other interests. In furtherance of said growth or expansion policy, Hoiles and Clarence, on behalf of petitioner and its predecessors, have been constantly in search of newspaper publishing business that could be purchased in whole or in part. Brokers have been contacted continually, and trade periodicals listing newspapers for sale have been examined regularly. In furtherance of this consistent plan of expansion in the newspaper field, petitioner and its merged predecessors have accumulated all available funds so as to be in a position to acquire other newspapers, or an interest therein, when the proper opportunity arose. As of about 1951, petitioner began to encounter certain difficulties in its attempts to acquire additional newspapers. External factors have contributed to petitioner's acquisition difficulties *94 since 1951. The number of newspapers published in the United States has remained constant or decreased during the last 15 years. Furthermore, the newspaper industry itself has undergone a period of consolidation since that date. Various newspaper organizations have pursued acquisition programs to take advantage of the economies associated with the operation of newspaper chains. By 1964, 131 newspaper chains then in existence had gained control of more than one-third of the daily papers published in the United States. Moreover, the increased competition among prospective buyers had produced a situation in which a price about 50 percent higher in relation to earnings must be paid for a newspaper today than that of 15 years ago. The inevitable result of these two factors has been a constantly decreasing number of independent newspapers available for purchase. Moreover, the acquisition of a newspaper presents unique and unusual problems. Desirable newspapers are not fungible commodities which are commonly available for purchase. Normally, the only newspapers available for purchase are those owned and operated by a single family or group of closely associated persons. Only when severe *95 financial difficulties are encountered or when the person dominant in the operation has decided to retire, or has died, do these papers normally become available for purchase. Even when such events do occur, acquisition is not easy. The owners who have been so intimately associated with the operation of the newspaper have to be convinced not only that the newspaper should be sold and that the price offered is fair, but that the prospective purchaser is the right party to make such purchase. Moreover, publishers cannot be persuaded merely by persistent proposals. Negotiations often continue over long periods of time. Despite the foregoing difficulties, petitioner actively continued to pursue its plans for external horizontal expansion during the years from 1952 to the present, including the years in issue. During 1954 petitioner, in attempting to negotiate a purchase, approached the owners of a newspaper near Odessa, Texas, but could not generate any particular interest. Finally, in about 1957, the owners appeared to become receptive to the idea of selling, and petitioner made an offer of $2,500,000 directly to the owners. The newspaper was owned by a single family, rife with internal *96 discord. Because of such situation, the offer was not accepted at that time. Petitioner did keep the offer open, including 1959 and 1960, the years in issue. Throughout these years the publishers of petitioner's newspaper at Odessa (Odessa American) kept in touch with the prospective sellers in an effort to consummate sale. Finally, in January 1964, the parties orally agreed to the sale at a price of approximately $3,900,000. The contract has been drawn up and signed by petitioner, and at the time of the trial herein, consummation appeared imminent. In May 1955, a broker, on behalf of petitioner, contacted the family owners of an Illinois newspaper. The broker was optimistic over the possibility of making the purchase because of the recent death of one of the family members. Before negotiations could be completed, however, another death in the family occurred, leaving one of the women members managing the newspaper. The woman has been unable to reach any definite decision as to whether or not to sell the newspaper. She has gone through alternate periods of interest and disinterest. Petitioner has been willing to pay about $2,000,000 for the newspaper, and the broker has maintained *97 periodic contact with the publisher. Negotiations were still in progress at the time of the trial herein. In October 1955 petitioner approached the owner of a South Dakota newspaper, but said owner stated that he had no intention of selling. Again in 1962 the owner was approached, and at this time a price of about $5,000,000 was agreed upon for the newspaper. The owner, however, wanted to be editor-in-chief after the acquisition. Although this was acceptable to petitioner, it would not agree that the owner could retain complete control over the newspaper's editorial policy. Because of this the sale was never completed, and the newspaper was sold to another newspaper chain. On February 29, 1956, petitioner, as aforementioned, participated in the purchase of the News. During the latter part of 1956 and during 1957 and 1958, a number of newspapers were investigated and actively considered by petitioner, but no acquisitions were made. In 1958 petitioner contemplated the acquisition of a newspaper in Florida at a price in the area of $10,000,000. Petitioner appraised the newspaper, and in 1959 negotiations for the purchase were initiated. In April 1959, however, the owner withdrew *98 the newspaper from the market. In 1959 a newspaper in Alaska was offered to petitioner. The owners wanted $375,000 for the newspaper, plus $125,000 for the building, or a total of $500,000. Petitioner seriously contemplated its purchase, until information was received that the business had an operating deficit of $20,000. At this point petitioner cancelled the negotiations. In March 1960 petitioner became interested in a Pennsylvania newspaper. Petitioner received the statement of an accounting firm, together with correspondence from several attorneys, showing the financial condition of the newspaper. The broker involved, however, was unable to develop anything further at that time. During 1960 a number of free circulation newspapers located in both California and Hawaii were offered to and considered by petitioner but, because of the type of operation, petitioner was not interested. As previously noted, during 1959 and 1960 petitioner had an offer outstanding of $2,500,000 [2] for the purchase of a newspaper located near Odessa, Texas, and one of petitioner's officers maintained contact with the owners in an effort to complete the acquisition. *99 In 1961 petitioner continued its active search for possible acquisitions. In February 1961 a broker offered two farm publications to petitioner at a price of $1,000,000. After a thorough investigation, however, petitioner determined that this was not a growing field and was therefore uninterested. Petitioner investigated at least six other newspapers during 1961, but for various reasons no purchases were completed. In one instance petitioner was extremely interested. A father and son, owners of an Alabama newspaper, wanted to sell because of the son's ill health. The asking price was $5,500,000. While petitioner was actively negotiating in an attempt to acquire the newspaper at a somewhat lower price, a third party intervened and purchased the newspaper at the owner's price. In another of petitioner's 1961 negotiations, conversations were had with a broker concerning the acquisition of a newspaper in Hawaii. The newspaper, however, was sold to a Hawaii group before negotiations with the petitioner had progressed to the point of an agreement. In March 1962 a newspaper near Los Angeles, California, was investigated by petitioner, and the owners were asked if they would entertain *100 an offer for $2,000,000. The owners subsequently notified petitioner that the paper was not for sale. On June 22, 1962, as aforementioned, petitioner purchased the stock of the Anaheim Bulletin Publishing Co., publisher of the Anaheim Bulletin, at Anaheim, California. The total obligation incurred by petitioner was $2,500,000, including $1,900,000 for the stock, $500,000 for a covenant not to compete, and a broker's fee of $100,000. Petitioner was willing to pay the full amount in cash, but an installment transaction was adopted to accommodate the owners. Petitioner paid $580,000 in cash, with the balance due in sixty quarterly installments. On July 17, 1963, as above-mentioned, petitioner purchased the assets of La Habra Publishing Co., publisher of the La Habra Star, and owner of 100 percent of The Brea Progress, Inc., publisher of The Brea Progress, located in La Habra and Brea, Orange County, California, respectively. The purchase price of these two newspapers was $542,980, including the broker's fee and a covenant not to compete. In furtherance of its planned expansion, petitioner carried on negotiations with about six other newspapers during 1963. The prices of these possible *101 acquisitions ranged from $500,000 to over $5,000,000. In about March 1964, petitioner was advised that a newspaper in San Bernardino, California, was for sale. The owners wanted to sell not only the newspaper but also a printing company, television station, and some real estate holdings for about $14,000,000. Petitioner engaged in active negotiations with the owner, and went to the point of obtaining a $7,500,000 loan commitment from a California bank. Petitioner was willing to put up $4,500,000 in cash. At the last moment the company, as a matter of preference, sold all the assets to the Los Angeles Times. On September 10, 1964, petitioner acquired the assets of Coachella Valley Publishing Co. which were related to the publication of Orange Daily News and Anaheim Gazette, located in Orange and Anaheim, Orange County, California, respectively. The price paid by petitioner was $200,000 cash and the assumption of a $9,000 liability. Also in 1964, petitioner negotiated for the purchase of a newspaper in Rapid City, South Dakota. The two owners decided to sell the newspaper, because of a death in the family. After hurried negotiations, both petitioner and a Minneapolis, Minnesota, *102 newspaper submitted identical written offers of $4,000,000 in cash. Petitioner had put up a $250,000 check as a deposit. Because the owners were acquainted with the owners of the Minneapolis newspaper, the newspaper was sold to them. At the time of this trial, petitioner had submitted a written offer of $2,780,000, which was still open, for a California newspaper. B. Potential Antitrust Liability. A second major consideration which entered into management's decision to retain the major portion of petitioner's earnings during the years in issue was the possibility of potential liability on account of alleged antitrust violations in connection with the operation of the News. When petitioner purchased the News in 1956, contracts had already been negotiated with the typesetters' union through May of 1957. At the termination of the contracts, petitioner and the union were unable to reach an agreement, and all but 18 of the News' employees went on strike. Sixty days later the striking employees started a competing newspaper known as the Lima Citizen (hereinafter referred to as the Citizen). The News' circulation decreased from 35,000 to 15,000 daily newspapers sold. The advertising *103 rates, which were predicated upon the amount of petitioner's circulation, had to be lowered and the News immediately began to operate at a deficit, losing approximately $430,000 in 1957. The Department of Justice informed the News on April 30, 1959, that it was investigating possible antitrust violations in the Lima, Ohio, newspaper market. Petitioner sought the counsel of a Los Angeles, California, attorney (hereinafter referred to as the attorney) who specialized in antitrust matters. The attorney immediately went to Lima, Ohio, and began an investigation of possible violations. He had discussions with individuals possibly involved, as well as with the Department of Justice and the lawyer for the Citizen. In July 1959, after a thorough investigation, the attorney expressed the following opinions to petitioner: (1) It was certain that the News, and petitioner as the controlling partner, would be the object of a civil antitrust suit by the Citizen. The potential liability under such a suit would be three times the fair measure of the worth of the Lima, Ohio, newspaper market. In specific terms, it would be approximately three times the amount that petitioner had paid for the *104 purchase of the News, namely, between $7 and $8 million. (2) The Department of Justice was conducting an investigation of the matter, and there was a decided possibility that a grand jury would be convened on the matter. The maximum financial liability under such an action would be $50,000 per count by way of fines under the Sherman Antitrust Act. (3) The cost of defending either the criminal antitrust suit or the civil treble damage suit could run as high as $500,000. (4) In his opinion, the News had not violated any antitrust law as interpreted by the courts at that moment, but because that area of the law was in flux, liability was a possibility. (5) Potential liability under either suit might be minimized or eliminated by a purchase of the Citizen. On the basis of the attorney's opinion, petitioner entered into active negotiations with the Citizen between July and September of 1959 in an attempt to purchase its newspaper operations. The parties however were unable to consummate an agreement. During 1960 petitioner continued its attempts to purchase the Citizen. The attorney also continually conferred during this period with the Department of Justice, which was still *105 in the process of its investigation. This situation was still unresolved by the end of 1960. During 1961 and 1962 petitioner's antitrust problems followed the same pattern as in 1960. In November 1963 the Citizen, as expected by petitioner, instituted a suit for treble damages against petitioner in the amount of $7,875,000. Petitioner counterclaimed for treble damages of approximately $20,000,000. Negotiations for the purchase of the Citizen, however, were still in progress, and in December 1963, a representative of the Citizen came to California to confer with petitioner. On February 4, 1964, petitioner settled its long-standing difficulties with the Lima Citizen Publishing Co., which published the Citizen, (1) by acquiring the Citizen's assets and a covenant not to compete and (2) by settling an antitrust lawsuit brought by the Citizen against petitioner. The total cost to petitioner was $1,462,000, with $200,000 of this amount being paid for settlement of the lawsuit. In 1964 the Department of Justice instituted a civil suit against petitioner, alleging antitrust violations dating back to 1957. In this action the Government has asked (1) that the covenant not to compete *106 (obtained in the purchase of the Citizen) be declared invalid, (2) that petitioner sell the News' assets to whom and at what price the court dictates, and (3) that petitioner refrain from intentionally operating at a loss in Lima, Ohio, with the intent of or effect of eliminating a competitor. Furthermore, during the latter part of 1964, a Federal grand jury convened in Toledo, Ohio, for the purpose of investigating the News and petitioner for possible criminal antitrust violations. The following are petitioner's comparative balance sheets for the years 1958 to 1961, inclusive: 1958
1959
1960
1961
Cash
$2,100,983.00
$ 2,771,761.87
$ 2,754,190.18
$ 3,210,661.07
Notes & Accounts Receivable
587,138.72
647,346.27
750,788.61
721,766.08
Newsprint Inventory
135,148.58
314,640.45
283,468.83
133,761.05
Prepaid Expenses
34,121.96
38,840.81
41,062.92
33,704.83
Listed Securities
167,133.93
441,621.91
764,249.28
1,086,925.66
Total Current Assets
$3,024,526.19
$ 4,214,211.31
$ 4,593,759.82
$ 5,186,818.69
Newsprint Investments
225,000.00
225,000.00
225,000.00
225,000.00
Partnership Investments
2,370,375.93
2,560,458.48
2,600,442.87
3,021,366.40
Depreciable Assets
3,282,152.08
3,428,822.64
3,899,254.83
4,023,516.05
Accumulated Depreciation
(986,284.34)
(1,163,425.13)
(1,319,027.39)
(1,498,304.73)
Land
200,850.20
200,500.20
200,500.20
200,500.20
Associated Press Bonds
450.00
600.00
600.00
600.00
Subscriptions and Goodwill
1,229,544.64
1,229,544.64
1,229,544.64
1,229,544.64
Cash Surrender Value - Life Insurance
68,417.00
91,888.00
115,389.00
138,901.00
Other Assets
171.91
Total Assets
$9,415,203.61
$10,787,600.14
$11,545,463.97
$12,527,942.25
Accounts Payable
$ 30,904.96
$ 14,701.29
$ 4,498.18
Expense & Other Accruals
118,349.19
122,186.71
147,046.94
$ 120,978.07
Accrued Income Taxes
587,480.76
1,076,609.96
1,095,249.72
1,188,953.24
Payments on Estimated Taxes
(160,000.00)
(228,509.18)
(456,900.00)
(470,207.00)
Unearned Subscriptions
17,386.25
17,386.25
17,386.25
20,911.25
Total Current Liabilities
$ 594,121.16
$ 1,002,375.03
$ 807,281.09
$ 860.635.56
Capital Stock
1,043,775.00
1,043,775.00
1,043,775.00
1,043,775.00
Earned Surplus
7,777,307.45
8,741,450.11
9,694,407.88
10,623,531.69
Total Liabilities and Capital
$9,415,203.61
$10,787,600.14
$11,545,463.97
$12,527,942.25
*107 The record does not indicate any borrowing from petitioner by its stockholders. No dividends were paid during the years under review. Petitioner prefers to pay cash for its acquisitions rather than incurring an indebtedness. It has never incurred indebtedness for the purpose of expanding plant facilities. The partnerships of which petitioner was a member did not distribute their entire net incomes during the years under review because of a policy to avoid fluctuating distributions dependent on earnings. It was deemed better for the other partners to maintain level or increasing distributions rather than to run the risk of having to reduce distributions in years when earnings had decreased. It was also considered desirable to maintain cash reserves for the purchase of fixed assets as needed. During the years under consideration officers' salaries paid were as follows: % of Common
Compensation
Compensation
Name and Title
Stock Owned
Paid in 1959
Paid in 1960
R. C. Hoiles
11.05
$ 57,000.00
$ 57,000.00
President
Clarence H. Hoiles
15.47
55,900.08
63,000.00
Vice-President, Secretary, General Manager
Harry Hoiles
19.04
48,000.00
42,000.00
Vice-President
Robert Hardie
1.65
11,200.08
45,000.00
Vice-President
James H. Hoiles
3.31
6,602.50
7,740.00
Assistant Treasurer
Robert Biles
0
11,200.00
12,500.00
Assistant Secretary
J. E. Lyons
0
11,013.90
Assistant Treasurer
Totals
$200,916.56
$227,240.00
*108 Analysis of Petitioner's Liquid Position Petitioner's earned surplus at the close of each year in issue was as follows: Year
Earned Surplus
1959
$8,741,450.11
1960
9,694,407.88
Petitioner's current assets, current liabilities, and working capital as of the close of its taxable years 1959 and 1960 were as follows: 1959
1960
Current Assets
$4,214,211.31
$4,593,759.82
Current Liabilities
984,988.78
789,894.84
Net Working Cap-
ital
$3,229,222.53
$3,803,864.98
The ratios of current assets to current liabilities during the years in issue were as follows: Year
Current Ratio
1959
4.28
1960
5.81
The following table shows the accumulated taxable income, the additional tax to shareholders if distributions had been made, the accumulated earnings tax determined, and the taxes saved by not making distributions: 1959
1960
Accumulated taxable in-
come
$913,634.66
$957,504.47
Additional tax to share-
holders if distributed
$636,596.37
$668,012.35
Less: Accumulated earn-
ings tax determined
340,749.34
357,639.22
Taxes saved by not
making distribution
$295,847.03
$310,373.13
Respondent, *109 in accordance with section 534(b), sent petitioner notice that he intended to issue a deficiency notice for the years 1959 and 1960 based on section 531. Petitioner, in accordance with section 534(c), sent respondent a statement setting forth its grounds upon which it relies to establish that its retained earnings for the years in issue were not permitted to accumulate beyond the reasonable needs of its business. Petitioner did not include in said statement facts relating to its proposed acquisition of the Citizen or to its potential antitrust liability in order to prevent publicity of its antitrust liabilities until the Department of Justice had completed its investigation and the Citizen's claim for treble damages had been disposed of. On February 26, 1963, respondent issued statutory notice in which he determined that petitioner was liable for tax under section 531 in the amounts of $351,338.57 and $364,170.20 for the years 1959 and 1960, respectively. Opinion Sections 531 and 532 impose an additional tax, designated an accumulated earnings tax, upon corporations formed or availed *110 of for the purpose of avoiding the income tax with respect to their shareholders by permitting earnings and profits to accumulate instead of being divided or distributed. The issue here is whether petitioner was availed of during its taxable years 1959 and 1960 for the foregoing proscribed purpose within the meaning of the above-mentioned sections. The question is one of fact. Helvering v. Nat. Grocery Co., 304 U.S. 282 (1938); James M. Pierce Corporation, 38 T.C. 643 (1962), reversed on another issue 326 F. 2d 67 (C.A. 8, 1964). Section 533 provides that the fact that earnings and profits are permitted to accumulate beyond the reasonable needs of the business shall be determinative of said proscribed purpose unless the corporation by the preponderance of the evidence shall prove to the contrary. Section 537 provides that the phrase "reasonable needs of the business" includes the reasonably anticipated needs of the business. However, to the extent petitioner can establish that it retained all or part of its earnings and profits to meet the reasonable *111 needs of its business, such amount will be allowed as a credit against its accumulated taxable income, subject to the accumulated earnings tax. Section 535(c). Thus, we must consider whether petitioner's earnings and profits were, in the years before us, accumulated beyond the reasonable needs of its business. Section 534 provides, in substance, that when respondent notifies a taxpayer corporation of his intent to issue a notice of deficiency imposing the accumulated earnings tax, the corporation, in response to such notice, may submit a statement of the relevant grounds (together with facts sufficient to show the basis thereof) on which it relies to establish that all or any part of the earnings and profits have not been permitted to accumulate beyond the reasonable needs of the business. The burden of proof with respect to whether the accumulation actually was beyond the reasonable needs of the business shall be on the respondent with respect to the grounds set forth in the taxpayer corporation's statement. While it appears that, at least with respect to its expansion plans, petitioner *112 was successful in shifting the burden to respondent, nevertheless, in view of the record presented herein, we deem it unnecessary to decide the burden question. In considering whether petitioner's retention of earnings during the years in issue was for the reasonable needs of the business, we must determine whether accumulations prior to 1959 and 1960 were, in fact, sufficient to meet petitioner's needs during the years in issue. However, this Court, in John P. Scripps Newspapers, 44 T.C. 453 (1965), has stated that a comparison of the total retained earnings of prior years and current profits with the reasonably anticipated needs of the business is not meaningful apart from a consideration of the nature of the accumulated surplus. It therefore follows that the employment of working capital by a business for the purchase of fixed assets, although not an occasion for a charge against earned surplus in an accounting sense, does, in fact, decrease the amounts of funds available for operating purposes. Furthermore, the taxpayer during the years in issue must have been in a sufficiently liquid position to allow the distribution of a dividend. See Smoot Sand & Gravel Corporation v. Commissioner, 274 F. 2d 495 (1960), *113 affirming a Memorandum Opinion of this Court, certiorari denied 362 U.S. 970 (1960). We shall, therefore, examine petitioner's earned surplus, business needs, and its actual liquidity within the foregoing frame of reference. We note that the ascertainment of the reasonable needs of a corporation is in the first instance a task for the officers and directors of the corporation. Courts should be hesitant to attribute a proscribed motive to the corporation unless it is clearly warranted by the facts and circumstances surrounding the questioned accumulation of earnings and profits. Crawford County Printing & Publishing Co., 17 T.C. 1404 (1952). Specific Needs of Petitioner's Business for Which It Accumulated Earnings A. Expansion. The major dispute in this case involves the question of whether petitioner accumulated funds for the purpose of expanding its business. As alluded to above, the purpose of section 531, as is evident from the wording of section 532, is to prevent the shareholders of a corporation from using the entity as insulation against personal *114 income taxation. However, completely foreign to such misuse of the corporate form is the accumulation of earnings for use in expanding the business. Respondent's regulation, section 1.537-2(b), Income Tax Regs., recognizes the propriety of retaining earnings for the expansion of a corporation's business. However, it is well settled as a matter of law that a taxpayer's plans in connection with a proposed acquisition or program of expansion must be definite and certain before they will be considered reasonable needs of the business. Wellman Operating Corporation, 33 T.C. 162 (1959). In the years subsequent to the 1950 merger, petitioner was not only motivated toward expansion by reason of its aim to achieve a greater dissemination of its political views, but also by various economic factors. The newspaper industry had begun a period of consolidation with the large metropolitan dailies actively pursuing acquisition programs of their own. This trend toward the large chain operation threatened the independent existence of petitioner. Unless petitioner could *115 maintain its relative position by acquiring additional newspapers, it, too, might be eventually absorbed by one of the larger groups. Furthermore, petitioner's promising young executives had to be given greater responsibility and financial opportunity or they would be lost to competing newspapers. This could best be achieved by the acquisition of additional newspapers, and the consequent movement of these younger men into positions of responsibility. Also of significance to petitioner's expansion program were the economies of scale associated with a chain operation. All the above factors contributed to making expansion, by means of further acquisitions, a necessary objective of petitioner in the years subsequent to its formation. This was true during 1959 and 1960. With the importance of these needs in mind, we believe that petitioner actively continued its plan of expansion, including during the years in issue. Respondent's major quarrel is that petitioner had no "specific and definite plans" to use the accumulations for its expansion needs. The basis of respondent's position is apparently that petitioner neither purchased any newspapers during the two years in issue nor *116 had any written offers of purchase outstanding at the close of either year. Respondent argues that petitioner's negotiations failed to produce any necessity during the years in issue to accumulate funds for the purchase of any particular business. However, in contending that petitioner's expansion plans were not "definite and certain" for the above reasons, we believe that respondent has misconstrued the line of cases defining those terms. In two recent cases, John P. Scripps Newspapers, supra, and Bremerton Sun Publishing Co., 44 T.C. 566 (1965), this Court has recognized that the "definite and certain" requirement with respect to plans of expansion must be analyzed in the context of the particular business involved. Therefore, the specificity of petitioner's plans for expansion must be judged in light of the problems common to the newspaper business and the acquisition of newspapers. These problems are in a sense unique. A newspaper in no way resembles a fungible commodity. A prospective customer cannot merely place an order or draw plans, as for a piece of machinery or additional construction. He can do no more than actively search out opportunities *117 for acquisition, either personally or through brokers. However, there is no assurance that his investigation and negotiation will culminate in an acquisition of any particular newpaper in any particular month or year. Typically, the only newspapers available for purchase are owned by a single family or a closely associated group of persons, who have operated the paper for a number of years. Normally a newspaper business is placed on the market only when severe financial difficulties occur or when the person dominant in the operation has decided to retire or has died. Even then, however, acquisition is difficult. The owners, so long associated with the publication, often treat the newspaper as a second child. An additional difficulty in such acquisitions, prevalant during the years in issue, was brought on by the trend toward consolidation in the newspaper industry. The inevitable result has been that fewer newspapers are available for purchase, with fierce competition among prospective buyers. In view of the foregoing, we cannot rule that petitioner's expansion plans lacked definition and certainty merely because petitioner neither purchased any newspapers during the two years *118 in issue nor had any written, as opposed to oral, offers of purchase outstanding at the close of either year. Moreover, the cases in which a taxpayer's expansion plans have been found to lack the necessary degree of definition and certainty are distinguishable from the facts now before us. Unlike the case at bar, those cases were devoid of evidence that the taxpayer's alleged plans or intent were accompanied by some concurrent course of action, by the taxpayer therein, directed toward the averred purpose of the accumulation. See KOMA, Inc. v. Commissioner, 189 F. 2d 390, 396 (C.A. 10, 1951), affirming a Memorandum Opinion of this Court; Smoot Sand & Gravel Corp. v. Commissioner, 241 F. 2d 197, 202 (C.A. 4, 1957), reversing and remanding a Memorandum Opinion of this Court, certiorari denied 354 U.S. 922 (1957); and American Metal Products Corporation, 34 T.C. 89 (1960), affd. 287 F. 2d 860 (C.A. 8, 1961), wherein a taxpayer attempted to establish its expansion plans solely on the basis of corporate minutes. This Court in American Metal Products Corporation, supra, noted that the record showed no evidence *119 of actual steps being taken to effectuate the alleged plans of expansion. In the somewhat unique circumstances presented herein, petitioner followed the only course open to a growing newspaper business desirous and in need of further expansion. We have set forth in our Findings of Fact with great detail the concrete and definite action which petitioner took during the years in issue with regard to acquisition of newspapers. In view of the business in which petitioner was engaged, this course of conduct effectively refutes and fully and sufficiently answers respondent's contention that petitioner's expansion plans were not definite and certain during the years in issue. B. Potential Antitrust Liability. Petitioner contends that its second major justfication for accumulating further earnings and profits in 1959 and 1960 arose from the likelihood of having to defend a 7 to 8 million dollar civil antitrust lawsuit. [3] Petitioner does not argue that it could reasonably accumulate $7,000,000 to meet such a contingent liability. Petitioner only contends that under the circumstances then existing it was justified in considering this contingent liability in reaching its decision not to *120 declare dividends in 1959 or 1960. It appears well settled that a corporation can accumulate funds to satisfy a contingent liability. William C. Atwater & Co., 10 T.C. 218 (1948). Respondent does not contend otherwise. However, he maintains (1) that the possibility of potential antitrust liability was an "unrealistic contingency upon an unrealistic contingency," (2) that such a contingent liability could not be "reasonably anticipated," and (3) that petitioner's retention of earnings to provide for such a contingency was therefore not a reasonable business need. Respondent's initial "unrealistic contingency" involves the question as to whether the Citizen would actually institute a 7 to 8 million dollar treble damage suit against petitioner. Respondent's positon is evidently premised upon his conclusion that petitioner's attorney merely opined that such *121 a suit possibly might be brought at some infinite time. However, that was not the case. Instead, after intensive investigation, the attorney stated that petitioner certainly would be sued by the Citizen. Moreover, the fact that during the years in issue the Department of Justice was actively engaged in an investigation of petitioner's Lima activities clearly establishes that petitioner's fears of impending antitrust litigation can in no sense be considered as grounded upon an unrealistic contingency. Respondent's alleged second "unrealistic contingency" involves the question as to whether petitioner could successfully defend said anticipated antitrust suit. Respondent points to the attorney's opinion that petitioner had violated no antitrust law and concludes that there was hence no reason to accumulate earnings on this account. The attorney, being aware of the rapid change in antitrust law at that time, indicated to petitioner that no finality should be attributed to his opinion regarding eventual liability. Petitioner certainly did not treat this potential liability lightly. Upon the attorney's suggestion that this potential liability might be eliminated or minimized by purchasing *122 the Citizen, negotiations with the Citizen were immediately undertaken to effectuate such purchase. The fact that the Citizen's suit was disposed of in 1964 by the purchase of the Citizen and payment of $200,000 in settlemen of the suit, does not detract from the gravity of the situation throughout the years in issue. Conclusion We are satisfied that petitioner's management, acting for the best interest of petitioner, decided with good reason that the retention of earnings during 1959 and 1960 were necessary (1) to carry out its expansion plans and (2) to provide a cushion against possible antitrust liability. At the end of both of these years, petitioner was negotiating for the purchase of the Citizen (for which it eventually paid $1,462,000) and had the "Odessa offer" outstanding for a price of $2,500,000. Taking into account the amount of petitioner's net current assets during the years before us, petitioner's accumulation was clearly not excessive in the light of its expansion plans. (The magnitude of petitioner's plans is further substantiated by the negotiations in 1961 with the Alabama paper at a price of approximately $5,500,000.) Therefore, we see no reason to discuss *123 the other grounds which petitioner proffers for justifying its retention of earnings in 1959 and 1960. Accordingly, we hold that the accumulation of petitioner's earnings during the years involved herein was not beyond the reasonable needs of its business. In view of the credit provided for in section 535(c)(1), it is unnecessary for us to consider whether or not petitioner was availed of for the proscribed purpose. John P. Scripps Newspapers, supra. In the instant case the credit would be equal to the full amount of the retained earnings. Therefore, even if petitioner were availed of for the proscribed purpose, under section 535(a) the accumulated taxable income, on which section 531 tax is imposed, would be zero. Therefore, we decide for petitioner. Decision will be entered for the petitioner. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.↩
2. In January 1964, the parties orally agreed to the sale, at a price of approximately $3,900,000. The contract has been drawn up and signed by petitioner, and at the time of trial herein, consummation appeared imminent.↩
3. This contention was not included in the sec. 534(c)↩ statement filed by petitioner and there is, as a result thereof, no question concerning the burden of proof relating to such ground. See p. 20 supra.