**KERR–COCHRAN, Incorporated, a Nebraska Corporation, Petitioner,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 15479.**

United States Court of Appeals
Eighth Circuit.

March 11, 1958.

James D. Conway Hastings, Neb., for petitioner.

Harry Marselli, Atty., Dept. of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Ellis N. Slack and Lee A. Jackson, Attys., Dept. of Justice, Washington, D. C., with him on the brief), for respondent.

Before SANBORN, WOODROUGH and JOHNSEN, Circuit Judges.

JOHNSEN, Circuit Judge.

The Commissioner determined deficiencies of $35,621.01 and $25,727.93, for the years 1949 and 1950, in petitioner's income taxes. The Tax Court upheld the deficiencies, and the matter is before us on petition for review.

The deficiencies represented surtaxes imposed under the provisions of 26 U.S.C.A.Int.Rev.Code of 1939, § 102(a), that "There shall be levied, collected, and paid for each taxable year * * * upon the net income of every corporation * * * if such corporation * * * is formed or availed of for the purpose of preventing the imposition of the surtax upon its shareholders * * * through the medium of permitting earnings or profits to accumulate instead of being divided or distributed, a surtax * * *", at rates set out in the section.

■■ This provision subjects a corporation to a special tax of a penalty nature, whenever it has undertaken or allowed itself to be used in any taxable year to accumulate earnings or profits of that year for the purpose of enabling its shareholders to escape the taxes of a distribution. And even though a part of these earnings or profits could reasonably have been made the basis of accumulation, all thereof that is not distributed may be subjected to the penalty tax under § 102 of the 1939 Code, if the motive prompting the accumulation is the avoiding of taxes to the shareholders. 7 Mertens Law of Federal Taxation, Rev.Ed.,

§ 39.25. Nor is it necessary to the imposing of the penalty tax that the avoiding of taxes to the shareholders be the sole purpose behind the accumulation; "it is sufficient if it is one of the determining purposes". World Pub. Co. v. United States, 10 Cir., 169 F.2d 186, 189; Trico Products Corp. v. Commissioner, 2 Cir., 137 F.2d 424, 426.

A prima facie test and presumption have been allowed the Commissioner and the Tax Court for establishing purpose in accumulation—that of whether the accumulation is one that is beyond the reasonable needs of the business. There is an express legislative provision that "The fact that the earnings or profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid surtax upon shareholders unless the corporation by the clear preponderance of the evidence shall prove to the contrary". Code of 1939, § 102(c).

It will be noted that the basis of the prima facie test and presumption under the statute is "reasonable needs of the business", and not managerial desires or ambitions as a matter of requiring examination at that stage of the question of good faith or absence of intent to aid stockholders. Without regard to actual motive, the statute permits a purpose to violate § 102 to be presumed, when any accumulation of earnings and profits is found, on objective evaluation, to have been engaged in, for the taxable year, beyond the reasonable needs of the business. And this presumption, when established, is made to have a special nature and effect, in that § 102(c) allows it to become determinative or conclusive of purpose to avoid surtax upon shareholders, unless the corporation undertakes and is able to prove by a clear preponderance of the evidence the absence of such purpose.

In making it workably possible for the presumption to be established, the courts have taken the view that the term "reasonable needs of the business", as used in the statute, was meant to have a practical and objective basis and so to entitle

the Commissioner and the Tax Court to look only at the immediate needs of the business [1]—"need associated with the business in hand". See McCutchin Drilling Co. v. Commissioner, 5 Cir., 143 F.2d 480, 482; Wilson Bros. & Co. v. Commissioner, 9 Cir., 124 F.2d 606, 609; World Pub. Co. v. United States, D.C.Okl., 72 F.Supp. 886, 894, affirmed 10 Cir., 169 F.2d 186.

Immediacy of need may involve operational expediencies or growth requirements, which are realistically manifest in the corporation's situation, and which are conventionally related to such a measure of accumulation as their source. But immediate need does not go farther than direct and present apparency. It does not, under § 102(c) of the 1939 Code, reach to visionary hopes or ambitions, nor does it compel blind acceptance of marked sweeps from previous rudder course, just because they have been undertaken. The Tax Court has the right, as a basis for setting up the presumption under the statute, to engage in judgment of its own on projections or expansions in the corporation's enterprise or facilities, whether resting in plan or undertaking, which seem to represent business anachronism in the corporation's situation, or which appear to constitute fiscal artificiality in making earnings accumulation their source—thus casting on the corporation the burden of demonstrating that no purpose to avoid surtax upon shareholders has been involved in the accumulation.

Indeed, radical changes in the business of a corporation, on the basis of an accumulation of earnings and profits, may themselves be capable, without regard to the presumption of § 102(c), of pointing toward a violation of the statute, or, as Treasury Regulation 111, Sec. 29.102—3 expresses it, "may afford evidence of a purpose to avoid the surtax".

In the establishment of the presumption of § 102(c), whether a corporation has accumulated earnings and profits for a taxable year beyond the reasonable needs of its business, or whether it otherwise, from nondistribution, has been availed of for the purpose of enabling its shareholders to avoid surtax, is essentially a question of fact for the Tax Court's determination on the whole of the particular situation. Helvering v. National Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346; Helvering v. Chicago Stock Yards Co., 318 U.S. 693, 63 S.Ct. 843, 87 L.Ed. 1086; Wilkerson Daily Corp. v. Commissioner, 9 Cir., 125 F.2d 998, 1000; Medical Arts Hospital v. Commissioner, 5 Cir., 141 F.2d 404, 405; W. H. Gunlocke Chair Co. v. Commissioner, 2 Cir., 145 F.2d 791, 796.

While, as suggested above, the question of reasonable needs of a business primarily involves consideration of objective factors, these are not generally of such absoluteness on their face as to make the answer to the question a matter of law. Nor is the task of the Tax Court simply one of choosing and aggregating the various objective elements. Practical evaluation of the whole situation involves an exercised, proper business judgment—but with that judgment being entitled to have as part of its background the realities which have prompted the statute, and not being required to be exercised on the basis of the plenariness within which management otherwise has the right to have its actions unquestioned. The function of exercising judgment and making evaluation within these bounds is as to § 102(c) exclusively the Tax Court's. Helvering v. National Grocery Co., 304 U.S. 282, 58 S.Ct. 932, 82 L.Ed. 1346.

For these reasons, a considered finding of the Tax Court under § 102(c), that earnings or profits have in a particular situation been permitted to accumulate beyond the reasonable needs of the business, when there is nothing in the record to indicate improper process in consideration, may not be overturned by

[1]. In the Internal Revenue Code of 1954, § 537, 26 U.S.C.A. § 537, the scope of the term "reasonable needs of the business" has been legally extended, to include "the reasonably anticipated needs of the business."

a Court of Appeals, if there exists on the evidence as a whole substantial probative substance, whether direct or circumstantial, as a basis for it. Egan v. Commissioner, 8 Cir., 236 F.2d 343; Bride v. Commissioner, 8 Cir., 224 F.2d 39; Smoot Sand & Gravel Corp. v. Commissioner, 4 Cir., 241 F.2d 197; Beckton, Dickinson & Co. v. Commissioner, 3 Cir., 134 F.2d 354; McCutchin Drilling Co. v. Commissioner, 5 Cir., 143 F.2d 480; K O M A, Inc. v. Commissioner, 10 Cir., 189 F.2d 390.

The task of appraising need and adjudging reasonableness in relation thereto as to a particular situation of accumulation is ordinarily not an easy one, even under the practicality allowed the Tax Court by the immediacy doctrine discussed above. Margins of relativeness for making evaluation will almost always exist in the immediate objective factors surrounding the corporation's action. In these circumstances, it is only natural that the Tax Court should turn to and oftentimes find its general persuasion becoming crystallized by some aspect of conduct or policy on the part of the corporation, in dealing with its funds, or even in other respects, which is out of character with reality in business need or immediacy thereof, as a basis of accumulating earnings for the taxable year involved.

Thus, the fact that the corporation is advancing or loaning money to stockholders may come to have a special crystallizing significance in the Tax Court's evaluation of the overall elements of some particular situation. See United Business Corporation v. Commissioner, 2 Cir., 62 F.2d 754, 755. The same may be true in other situations of the fact that the corporation is making investments in outside securities. See J. M. Perry & Co. v. Commissioner, 9 Cir., 120 F.2d 123, 126. Similarly, may a use of earnings and profits to buy property for rental and revenue purposes, without any proximateness to the corporation's regular business, tend to persuade in some situations that accumulation is being engaged in beyond the reasonable needs of the business, as related to the statutory object of encouraging stockholder distributions.

These are merely examples of special factors which, when present, may serve to tip the scales on the elements generally, in the Tax Court's evaluation of whether the corporation is permitting earnings and profits to be accumulated beyond its reasonable business needs. Other special elements of action or policy can also exist which equally may become a crystallizing agent for persuasion as to the lack of reasonable need in the circumstances of a particular situation. And the presence of such a special element, to which the Tax Court has accorded signifiance in its evaluation, has usually been given recognition and emphasis by a Court of Appeals, in its examination of whether, on the evidence as a whole, a substantial probative basis exists for the Tax Court's finding. See generally 7 Mertens Law of Federal Taxation, Rev. Ed., § 39.32.

■ A properly supported finding that accumulation has been engaged in beyond the reasonable needs of a business is, as noted, conclusive under § 102 of intent to avoid taxes upon shareholders, unless the corporation has clearly and convincingly demonstrated that no such purpose did in fact exist.

In the situation before us, the corporation was one which had, as set out in the Tax Court's opinion, outstanding capital stock in the amount of $21,900 and a paid in surplus of $1,825. The stock was all owned by Claren Kerr, president of the corporation, except for some nominal amounts standing in the names of two other individuals, apparently for qualification purposes.

For the year 1946, the corporation had had a net income after taxes of $33,599.38, none of which it distributed in dividends. This left it with earned surplus and undistributed profits at the close of that year of $44,569.40. In 1947, although its earnings had materially increased, it similarly made no distribution of any of its earnings or profits, so that

at the close of that year it had accumulated earned surplus and undistributed profits in the amount of $136,621.86. Repetition for 1948 built up its earned surplus and undistributed profits to $248,323.97. A similar course in 1949 left it with earned surplus and undistributed profits of $369,417.51. The same treatment of its earnings for 1950 made the amount of the earned surplus and undistributed profits $460,850.55. In 1951, it became $544,985.37.

At the close of each of the years 1949 and 1950, which are the two tax-years here involved, the corporation thus was sitting with an accumulation which had a ratio, as between current assets and current liabilities of over four to one.

Claren Kerr chose to draw a salary of only $3,600 per year for his services as president and managing officer of the corporation. He had the right, in addition, to receive a bonus each year of 15 per cent of the corporation's profits before taxes, but for the year 1949, when he had a net taxable income of $35,930.81 —some $32,000 over and outside his corporate salary—he chose to waive his bonus right. Had distribution been made, instead of permitting accumulation, of the corporation's net income after taxes, for each of the two years here involved, Claren Kerr would have had a liability of $72,143.98 more in income taxes for 1949, and $52,998.68 more for 1950, than what he was obliged to pay under his filed returns.

The corporation had been organized in 1939, to have its principal place of business at Hastings, Nebraska, and to engage primarily, as its articles indicate, in the activities of buying, selling, exchanging, servicing and repairing motor vehicles, as well as dealing in automotive equipment and other merchandise, both at wholesale and at retail. A number of specific powers were enumerated in the articles, such as the right to buy, sell and hold real estate, personal property, letters patent, etc.; each of which was characterized by some descriptive incidence such as "necessary", "useful", "convenient", or "expedient", and by some commercial

relationship such as "in connection with said business", or for "the proper conduct of the affairs of the corporation", or as a means of "furthering or attaining any of its objects".

Beyond this, there was also a general blanket provision authorizing the corporation "to do any and all other  *  *  * things and to exercise any or all powers which a copartnership or a natural person could do or exercise  *  *  *."

The corporation began business under a franchise as a local agency for the sale of Chevrolet automobiles and automotive parts in the Hastings, Nebraska, area. It was also authorized under its franchise to sell Chevrolet trucks on a fleet basis (5 or more) anywhere in the United States. To these activities, it added, as time went on, the selling of farm machinery, hydraulic hoists and truck bodies, and later the renting of trucks to contractors on government construction work, the raising of wheat in a joint venture, and the financing for purchasers of some of the sales which it made.

In 1948, it entered into a joint venture with two other parties, for the sale of automotive parts to the Chinese Nationalist Government, in connection with which it made and kept a deposit of $100,000 of its funds in a bank at Denver, Colorado, from 1948 to 1950 inclusive, as a credit guaranty for purchases made in carrying out the undertaking. This venture was, however, completed in 1950, with a profit to the corporation of approximately $60,000.

From 1949 to 1951, the corporation also made sales of new trucks to Peter Kiewit Sons Company, a large and widely operating general contractor, and purchased some of Kiewit's old trucks, with the balances involved in these dealings being carried on open account. The transactions involved were numerous and continuous, with the account balance having run as high as $189,000. But, as the Tax Court pointed out, these figures were largely of a bookkeeping aspect only, in that Kiewit always had, throughout the entire course of the transactions, promptly made payment of petitioner's state-

ments as they were received, and on a number of occasions the account contained a credit balance.

Commencing in April, 1951, the corporation further began to sell to Kiewit a large volume of trucks on which special equipment was installed for operation in a cold climate, with the sales being carried on open account under the name of North Atlantic Constructors. During the first month of these transactions, the account had a debit balance as high as $473,699.13, and to finance these starting operations the corporation made bank borrowings of $190,000, all of which it repaid within a three-week period. Borrowings in the amount of $65,000 were also made from private parties at about this time, and these too were duly repaid. The records of petitioner showed that all charges to the account of North Atlantic Constructors were promptly paid during its existence, usually within a matter of two or three weeks after they were placed on the books. Thus, as with the other Kiewit account, there was no such extension or carrying of credit involved as to cause a freezing of the corporation's working funds.

Varying advances of cash passed back and forth between Claren Kerr and the corporation mutually through the course of each of the years 1949 to 1951, on general account balances. Some times there was a balance in favor of the corporation and at other times in favor of Claren Kerr.

Besides this, Kerr had a special account to which were charged the costs of operating an unprofitable apple farm which he personally owned, with the corporation advancing the money to cover the losses as they accrued. This account thus contained an increasing debit balance from one year to the next, for funds paid out by the corporation in Kerr's favor and carried without interest, standing at $2,096.21 on December 31, 1948; at $5,596.21 on December 31, 1949; at $15,072.97 on December 31, 1950; and at $28,006.97 on December 31, 1951.

In June, 1949, the corporation engaged in buying with part of its accumulated funds a commercial building in Grand Island, Nebraska, for the sum of $70,000, and holding the building simply for rental purposes.

In 1950, with more of its accumulation, it began to build a warehouse structure in Hastings, Nebraska, for rental entirely to third parties, which structure was completed in 1951, at a total cost of $146,404.23, with payment of $59,193.99 being made in 1950 and the rest in 1951.

During each of the years 1948 to 1951, the corporation also had substantial sums outstanding as investments in oil leases and various securities. As of December 31, 1948, this amount was $34,057.26. As of December 31, 1950, it was $38,538.21.

In January, 1951, following the 1950 accumulation, the corporation purchased a garage building at Auburn, Nebraska, for $34,500, which it leased to Kerr's brother-in-law. To further help the brother-in-law in getting started in the automobile business, the corporation also made a loan to him on January 26, 1951, without interest, in the sum of $30,000. This loan, together with additional sums advanced to the brother-in-law, was carried on the books of the corporation as an account receivable, with the account containing a debit balance on December 31, 1951 of $37,429.75.

Again, shortly after the 1950 earnings were accumulated, the corporation allowed Claren Kerr to use funds in the amount of $32,518.27 to commence the construction of a residence for himself and his wife, with the advances being carried on the books as an account receivable, and with the account containing at the close of 1951 an unpaid balance of $29,897.61.

Similarly, in 1951, the corporation made funds available to Claren Kerr and a third party for purchasing lots and building houses, which advances aggregated in September, 1951, the sum of $28,009.27.

Through the two taxable years involved, as well as for the three years preceding, the corporation had also engaged in loaning money to Claren Kerr's wife,

without interest, and by account receivable. Until December 31, 1951, this account continuously contained a substantial debit balance. Thus, on December 31, 1948, Mrs. Kerr owed the corporation the sum of $12,039.32; on December 31, 1949, the sum of $17,304.12; and on December 31, 1950, the sum of $32,304.12—with payment of the account being made in full on December 31, 1951.

On these general elements and special factors for the crystallizing of persuasion, we would have no right to say that there existed no substantial probative basis for the Tax Court's finding, that the corporation had, for each of the taxable years involved, been permitting earnings and profits to accumulate beyond the reasonable needs of its business.

In so concluding, the Tax Court gave due consideration to the corporation's contention, that accumulation of the earnings and profits for 1949 and 1950 was justified and necessary to increase the financial strength of the corporation for purposes of the large volume of business which it engaged in during those years and 1951. The Tax Court pointed out in reply that the rate of current assets to current liabilities at the end of each of the years 1949 and 1950 was more than four to one, and that the addition to working capital, of such investment items as had been made and allowed to stand in the form of accounts receivable, "would have resulted in the accumulation of quick assets far in excess of the reasonable demands of the business".

To this, the Tax Court added that, as to the substantial amount of general investments which the corporation had made, such as gas and oil leases, securities, commercial rental properties, the building for the automobile business of Kerr's brother-in-law, etc., it was a reasonable inference on all the circumstances that these actions had been engaged in rather to satisfy the personal wishes of Claren Kerr than for corporate purposes.

Again, the Tax Court noted and felt that crystallizing significance existed in the fact that Kerr was in a position to make use of the accumulation of corporate funds for personal purposes, and did so, whenever he had need or was desirous of so doing. Thus, there was no economic reason for causing him to have any distribution made of the corporation's earnings. On the contrary, as has been mentioned, by permitting the earnings to accumulate instead of being distributed, he would for the years 1949 and 1950 escape having his personal tax liability increased by $72,143.98 and $52,998.68, respectively, while at the same time being left in a position to make such personal use of these and other sums as he might choose, as well as having them serve to materially increase the value of his equity for subsequent possible capital gains purposes, instead of being deprived of both the use and value of this substantial part of the earnings for these years through taxes.

■ The Tax Court found, on the overall aspects of these and other circumstances detailed in its opinion but not necessary to be repeated here, that the corporation had permitted earnings and profits to accumulate beyond the reasonable needs of the business. It viewed petitioner's evidence as not being sufficient objectively or in its inherent implications to overcome the presumption of violation of § 102(c) created by this determination. And, though it was not necessary to do so in the situation, it went beyond this, because it regarded the circumstances as being so strong in their persuasiveness as to the reasons for the accumulation, and further found that, independent of the presumption created by its finding as to accumulation having been permitted beyond the reasonable needs of the business, the corporation had as a matter of actual fact been availed of for the purpose of preventing the imposition of surtax upon its shareholders (Claren Kerr). Both of these findings rest in our opinion upon a substantial probative basis.

The decision of the Tax Court must accordingly be affirmed.