The SCHENUIT RUBBER COMPANY

v.

UNITED STATES of America.

Civ. No. 17579.

United States District Court
D. Maryland.

Oct. 23, 1968.

Theodore R. Dankmeyer, Baltimore, Md., and Lionel C. Epstein and Richard J. Medalie, Washington, D. C. (Niles, Barton & Wilmer, Baltimore, Md., and Epstein and Friedman and Ginsburg & Feldman, Washington, D. C., on the brief), for plaintiff.

Moshe Schuldinger and Richard Seidman, Attys., Civil Tax Division, Dept. of Justice, Washington, D. C. (Mitchell Rogovin, Asst. Atty. Gen., and Donald R. Anderson, Atty., Civil Tax Division, Washington, D. C., and Stephen H. Sachs, U. S. Atty., Baltimore, Md., on the brief), for defendant.

THOMSEN, Chief Judge.

In this action, tried before the Court without a jury, plaintiff (taxpayer) seeks recovery of accumulated earnings taxes [1] and interest thereon, assessed against and paid by it for its taxable years ended April 30, 1961 ($339,602.23) and April 30, 1962 ($300,526.39). The ultimate question to be decided is whether taxpayer was availed of during either or both of those years for the purpose of avoiding income tax with respect to its stockholders by permitting earnings and profits to accumulate instead of being distributed. The principal subsidiary issues are: (I) whether in either or both years taxpayer's earnings and profits were permitted to accumulate beyond the reasonable needs of the business, including the reasonably anticipated needs of the business; and (II) if they were, whether taxpayer has proved that such accumulations were not made for the purpose of avoiding the income tax with respect to its stockholders.

## FACTS

■ Many of the relevant facts and figures are contained in a stipulation, supported by a mass of documents, and in a tentative stipulation dealing with events which occurred after April 30, 1962, likewise supported by documents. The parties agree and the applicable authorities support the view that evidence of subsequent events may be considered for certain purposes.[2] Both sides also offered some oral testimony.[3]

The background facts will be set out first. The facts dealing with a particular point will be set out in the discussion of that point.

### History of the Business

Taxpayer's founder, Frank G. Schenuit, began to manufacture automotive tires around 1912, and in 1928 opened a factory in the Jones Falls Valley in Baltimore. He operated as a sole proprietorship until 1945, when taxpayer was incorporated. In 1939, Schenuit entered the aircraft tire field, and with the onset of World War II, produced little but military aircraft tires. In 1945, all government contracts were cancelled, leaving the business in such a precarious position that there was serious question whether it would survive. During the post-war period, taxpayer resumed production of automotive tires. Its retail outlet proved unprofitable, however, and in 1949 taxpayer began marketing through distributors. Taxpayer thereafter placed increasing emphasis on the manufacture of non-automotive industrial tires, with sales primarily to equip-

1. Provided for by section 531 et seq., I. R.C.1954, summarized and discussed later in this opinion.

2. E.g., to determine whether taxpayer actually consummated the plans for which it claims the earnings were accumulated and to support or attack the credibility of the testimony with respect to the reasons for the accumulations, but not to permit justification for such accumulations based upon subsequent events which were not considered by the directors during the taxable years in question. The expert witnesses called by each side referred to events in subsequent years to justify their respective conclusions. See Fenco, Inc. v. United States, 234 F.Supp. 317 (D.Md.1964), aff'd per curiam, 348 F.2d 456 (4 Cir.

1965); Motor Fuel Carriers, Inc. v. United States, 322 F.2d 576 (5 Cir. 1963); American Metal Products Corp. v. C.I.R., 287 F.2d 860 (8 Cir. 1961); Reg. § 1.-537–1(b) (2); H.R.Rep.No.1337, 83d Cong., 2d Sess. 53 (1954); S.Rep.No. 1622, 83d Cong., 2d Sess. 69–70 (1954), U.S.Code Congressional and Administrative News, pp. 4025, 4629; Mertens, The Law of Federal Taxation, Code Commentary, § 533, at G–7; Ted Bates & Co., 24 T.C.M. 1346 (1965); Freedom Newspapers, Inc., 24 T.C.M. 1327 (1965); and Bardahl Mfg. Co., 24 T.C.M. 1030 (1965).

3. The credibility of that testimony and the weight to be accorded the opinions of the expert witnesses have been considered by the Court in making the findings of fact set out below.

ment manufacturers, and resumed the manufacture and sale of aircraft tires for private planes. After the start of the Korean War in 1950, sales of military aircraft tires became the major part of taxpayer's business.

Taxpayer's earnings and profits fluctuated from year to year, and were subject to renegotiation on military contract sales, which generally reduced the profit margin on such sales to 15%. Taxpayer's total business increased substantially from 1949 to 1960, but the increase was not steady and taxpayer's management could not predict from year to year whether the next year would be a good one.[4]

During the eight years ending April 30, 1955, taxpayer had made gross additions of $937,481 to its plant. In 1955 it embarked on a program to increase plant capacity and to modernize its production, research and testing equipment.[5] So, during the fiscal years 1956–1962, inclusive, taxpayer spent $3,964,436 for fixed assets, and the net additions to fixed assets after depreciation amounted to $2,283,734.

During those years taxpayer's principal lines of business were military aircraft tires and industrial tires. Its automotive tire sales had dropped to about 11 percent of its business.[6] Its civilian aircraft tire sales were never large.

Taxpayer's military aircraft tire sales fluctuated with the government's needs and procurement policies. Before February 1961, prices of tires and tubes sold to the armed forces were taken from GSA's Federal Supply Schedule, which was determined by annual government-industry negotiation. In February 1961, however, the government began requiring competitive bids on all contracts involving more than $100,000, and by the end of May 1962, all government contracts had been placed on a competitive bid basis. Taxpayer reasonably feared that, under the new system, its bid prices would usually be higher than the bids of one or more of its large competitors,[7] either because of their lower costs or because their vast financial resources would enable them to bid below cost.[8] During the period of changeover to competitive bidding, taxpayer's government business declined sharply, and its net income after taxes dropped from $985,700 in fiscal 1961 to $740,979 in fiscal 1962 and to $78,082 in fiscal 1963.

Taxpayer's industrial tire production embraced tires and tubes for a wide variety of products, including garden equipment, sporting appliances and miscellaneous small industrial equipment.

Before 1961, taxpayer's directors had considered the advisability of purchasing a wheel company, to aid in the development of its industrial tire line, because taxpayer then feared that emphasis on missiles might reduce the demand for military aircraft tires. After the change in the government's procurement policy in 1961, the need for expansion of the industrial tire line became acute.

4. See column showing net income before taxes in Schedule B, infra.

5. The military market imposed exacting quality control standards. Taxpayer was required to test prototype tires for high speeds on a dynamometer, a machine that simulates aircraft landings. The government had permitted taxpayer to use the dynamometer at Wright-Patterson Air Force Base on a "time available" basis, i.e., when the Air Force did not require the use of the machine for its own purposes. However, by May 1960, the use of the Wright-Patterson facility by the Air Force had increased to the extent that taxpayer was experiencing serious delay in qualifying its product. To avoid loss of government sales, tax-

payer found it necessary to construct a tire-testing facility at its Baltimore plant.

6. Taxpayer contemplated withdrawing from that line, but worked out an agreement with Lee Tire and Rubber Company to manufacture Schenuit-brand passenger tires using taxpayer's molds and specifications.

7. The only companies producing military aircraft tires were taxpayer and the five giants of the industry, namely, Goodyear, Goodrich, Uniroyal, Firestone and General.

8. Taxpayer expressed these fears in its correspondence with Air Force procurement officials.

### Ownership and Management

Following Mr. Schenuit's death in 1948, the ownership of all stock issued by taxpayer passed to his three daughters. Each then owned 248⅓ shares of its one-class stock, and an undivided one-third interest as tenants in common in $200,000 subordinated 6% notes.

The president and active head of the corporation from 1948 until 1963 was Roy Neely, who had grown up in the business, but owned no stock or other proprietary interest therein.

Edgar H. Spilman, Albert E. Thompson and Oliver S. Travers, the husbands of the stockholders, entered the business in 1945, 1948 and 1953 respectively; and were officers and directors until 1959, when Spilman resigned and was succeeded as a director by his wife. The other directors during the tax years in question included Neely (taxpayer's president and treasurer), Theodore R. Dankmeyer (an attorney), Ernest E. Wooden (a CPA), John D. Wright (an attorney specializing in tax matters, who joined the Board in 1959), and two minor officers of the company.

In fiscal 1956, taxpayer declared a stock dividend on its common stock of 9,005 shares, with a total par value of $900,500. In fiscal 1960, the common stock was again split, and an additional 9,750 shares were issued with a total par value of $975,000. In each instance, the additional stock was issued at the suggestion of Wooden, to transfer from earned surplus to capital stock the increased investment in plant and equipment. See balance sheet for the year ending April 30, 1961, in Schedule A.

Taxpayer paid no cash dividends until 1955. From fiscal 1955 through fiscal 1958, it paid a token dividend on its common stock. See Schedule B. From 1958 through the taxable years in question, it paid a dividend of $6.00 a year on each share of its preferred stock, but paid nothing on its common stock.[9] Tax-

payer offered evidence tending to prove that no dividends were declared on the common stock during that period because the directors believed it was necessary to conserve cash for various purposes, which will be discussed in detail below.

Effective February 23, 1962, the shareholders approved a charter amendment authorizing a recapitalization of the Company, under which the common stock and the subordinated notes held by the shareholders were exchanged tax-free for 293,250 shares of Class A and 282,750 shares of Class B no par value common stock. The Class A and Class B stock carried substantially identical rights and privileges except that Class A was given the right to receive dividends while Class B had no such right. Partial conversion of Class B into Class A on a share-for-share basis was allowed at the option of the shareholder commencing January 1, 1965, and ending December 31, 1972, under prescribed conditions. In a letter to the Company dated February 14, 1962, the Commissioner of Internal Revenue ruled that the recapitalization was tax-free under the applicable sections of the Code.

On April 25, 1962, a public secondary offering of 240,000 shares of the Class A common stock was made to the public at a price of $14 a share or a total of $3,360,000. The net proceeds to the selling shareholders, after expenses, underwriters' discounts and commissions, which were borne by the selling shareholders, totaled $3,060,000. The shareholders did not sell any of the Class B common shares. The three selling shareholders retained 53,250 shares, or 18.15 percent of the Class A stock and 282,750 shares, or 100 percent, of the Class B stock. See Schedule A.

Following the secondary offering of the Class A stock to the public, a quarterly dividend of $0.1875, or an annual dividend of $0.75 was voted by the board of directors for fiscal 1963. See Schedule B.

---

9. During calendar years 1961, 1962 and 1963 the joint taxable income of the three shareholders and their husbands was such that they would have paid income taxes on cash dividends at rates of at least 47%.

## Schedule A

The balance sheets at the end of the tax years in question were as follows:*

| | For years ending | |
|---|---|---|
| | 4/30/61 | 4/30/62 |
| **Assets** | | |
| Cash and Short-term notes | $ 581,940.93 | $1,299,241.00 |
| Notes and Accounts Receivable–Net | 1,897,547.19 | 1,189,616.00 |
| Accounts Payable–Credit Balance | 327.00 | — |
| Inventories | 1,418,936.53 | 1,086,702.00 |
| Fixed Assets–Net | 2,607,032.84 | 2,854,214.00 |
| Other Assets | 165,893.28 | 182,000.00 |
| Total Assets – | $6,671,677.77 | $6,611,773.00 |
| | | |
| **Liabilities** | | |
| Accounts Payable–Trade | $ 289,949.38 | $ 209,840.00 |
| Accrued Expenses | 63,504.97 | — |
| Notes Payable | 175,000.00 | — |
| Dividend Payable | 9,000.00 | — |
| Other Liabilities–State and Federal taxes, other accrued expenses | 1,271,045.05 | 678,812.00 |
| | $1,808,499.40 | $ 888,652.00 |
| | | |
| **Capital and Surplus** | | |
| Capital Stock | | |
| Original Investment Common | $ 74,500.00 | $ 74,500.00 |
| Capitalized Earnings–Stock Dividend | | |
| Preferred | 300,000.00 | 300,000.00 |
| Common | 1,875,500.00 | 1,875,500.00 |
| Common–Exchanged for Notes | — | 175,000.00 |
| Earned Surplus–Not Capitalized or Distributed | 2,613,178.37 | 3,298,121.00 |
| | $4,863,178.37 | $5,723,121.00 |
| TOTAL – | $6,671,677.77 | $6,611,773.00 |

* The figures for April 30, 1961, are the figures shown on the balance sheet in the audit by Wooden, Benson & Walton, the Company's auditors for that year. The Capital and Surplus headings have been modified by the Court to conform more accurately with the evidence. The Court has also shifted from "Other Assets" to "Fixed Assets" the sum of $440,645.83, the amount of a deposit on a dynamometer which taxpayer had purchased. This modification was made on a reaudit for April 30, 1961, by Haskins & Sells, and the government conceded the propriety of the modification during the arguments herein. The figures for April 30, 1962, are the figures shown on the balance sheet for the audit by Haskins & Sells. The exhibits, arguments and briefs during and after the trial have been complicated by the fact that both parties, especially the government, have used various figures taken sometimes from pre-audit statements and sometimes from audited statements. The differences are not material, but are confusing.

### Schedule B

Taxpayer's net sales, net income, and cash dividends declared for the fiscal years ended April 30, 1955 through 1963 were as follows:*

| Year | Net Sales | Net Income Before Taxes | Federal Income Taxes | Net Income After Taxes | Cash Dividends Declared |
|------|-----------|-------------------------|----------------------|------------------------|-------------------------|
| 1955 | $5,686,279 | $1,175,096 | $ 605,352 | $569,744 | $ 14,900 |
| 1956 | 5,916,269 | 629,244 | 321,696 | 307,548 | 19,500 |
| 1957 | 6,858,998 | 1,138,340 | 586,216 | 552,124 | 39,000 |
| 1958 | 4,773,625 | 321,435 | 161,644 | 159,791 | 18,750 |
| 1959 | 8,722,428 | 1,467,082 | 757,383 | 709,699 | 18,000 |
| 1960 | 9,597,036 | 1,609,817 | 831,603 | 778,214 | 18,000 |
| 1961 | 11,826,388 | 2,042,083 | 1,056,383 | 985,700 | 18,000 |
| 1962 | 9,890,486 | 1,521,386 | 780,407 | 740,979 | 18,000 |
| 1963 | 7,806,667 | 147,411 | 69,329 | 78,082 | 237,944 |

\* These figures are taken from a stipulation of the parties. They vary a little from the audited reports, due to certain minor adjustments which are not disputed.

———◆———

### Statutes

Section 531 of the Internal Revenue Code of 1954 imposes for each taxable year an "accumulated earnings tax" on the "accumulated taxable income", as defined in section 535, of every corporation described in section 532, at the rate of 27½% of the accumulated taxable income not in excess of $100,000, plus 38½% of the accumulated taxable income in excess of $100,000.

Section 532 provides in pertinent part:

"(a) *General rule.*—The accumulated earnings tax imposed by section 531 shall apply to every corporation * * * [10] formed or availed of for the purpose of avoiding the income tax with respect to its shareholders or the shareholders of any other corporation, by permitting earnings and profits to accumulate instead of being divided or distributed."

The government does not contend that taxpayer was formed for the purpose specified in Section 532(a), but does contend that it was availed of for that purpose during the fiscal years ended April 30, 1961 and 1962.

Section 533, headed "Evidence of purpose to avoid income tax", contains the following provision:

"(a) *Unreasonable accumulation determinative of purpose.*—For purposes of section 532, the fact that the earnings and profits of a corporation are permitted to accumulate beyond the reasonable needs of the business shall be determinative of the purpose to avoid the income tax with respect to shareholders, unless the corporation by the preponderance of the evidence shall prove to the contrary. * * *"

Section 535(a) defines the term "accumulated taxable income" as "the taxable income, adjusted in the manner provided in subsection (b), minus the sum of the dividends paid deduction (as defined in section 561) and the accumulated

10. The omitted portion is an exception not important in this case.

earnings credit (as defined in subsection (c))."

Section 537 provides that the term "reasonable needs of the business" includes the reasonably anticipated needs of the business.

The applicable regulations are Treasury Regulations on Income Tax (1954 Code), 26 C.F.R., especially sec. 1.533–1, sec. 1.537–1, sec. 1.537–2, and sec. 1.537–3 (a). They are too long to be included in this opinion, but have been carefully considered by the Court.

## Discussion

### I.

### Accumulations and Needs

Were taxpayer's earnings and profits, during the taxable years ended April 30, 1961 and April 30, 1962, permitted to accumulate beyond the reasonable needs of the business, including the reasonably anticipated needs of the business?

The Commissioner's findings of fact are presumptively correct, and the burden of overcoming them rests on the taxpayer suing to recover alleged excessive tax payments. Fenco, Inc. v. United States, 234 F.Supp. 317, 322, n. 3 (D.Md. 1964), affirmed, 348 F.2d 456 (4 Cir. 1965). One such finding was that during the years in question taxpayer's earnings and profits had been allowed to accumulate beyond the reasonable needs of the business, including its reasonably anticipated needs.[11]

The controlling principles which this Court should apply in ruling on taxpayer's challenge to this conclusion were stated by Judge Sobeloff in Smoot Sand & Gravel Corp. v. C. I. R., 274 F.2d 495 (4 Cir. 1960), as follows:

"* * * [T]he size of the accumulated earnings and profits or surplus is not the crucial factor; rather, it is the reasonableness and nature of the surplus. Part of the surplus may be justifiably earmarked in the form of reserves, for specific, necessary business needs. Again, to the extent the surplus has been translated into plant expansion, increased receivables, enlarged inventories, or other assets related to its business, the corporation may accumulate surplus with impunity. (citations omitted). Where, on the other hand, the accumulation of surplus is reflected in liquid assets in excess of the immediate or reasonably foreseeable business needs of the corporation, there is a strong indication that the purpose of the accumulation is to prevent the imposition of income taxes upon dividends which would have been distributed to the shareholders * * *." 274 F.2d at 500, 501.

Some of the earnings and profits had been invested in fixed assets (plant and equipment) during previous years and additional amounts were so invested during each of the tax years in question. Taxpayer contends that the business reasonably needed the rest of its accumulated earnings and profits which were represented by cash or its equivalent, accounts receivable and inventory, (1) for current operations, and (2) for various anticipated needs of the business.

The Court will therefore determine (A) the amount of accumulated earnings and profits available for current and for reasonably foreseeable future needs at the end of each taxable year in question, and (B) the amount of such (1) current and (2) future needs at the end of each year. If the total of such needs —the sum of B(1) and (2)—at the end of the year in question exceeds the amount of accumulated earnings and profits at the end of such year, there can be no liability for a section 531 tax.

### (A)

*Amount of accumulated earnings and profits available for current and reasonably foreseeable future needs.* The Court finds that the total accumulated profits

---

11. He found that taxpayer had accumulated taxable income, as defined in section 535, in the amount of $717,433.92 for fiscal 1961 and $668,139.14 for fiscal 1962. Accordingly, there was assessed an accumulated earnings tax of $265,212.06 for fiscal 1961, and $246,233.57 for fiscal 1962, plus interest.

and earnings available on April 30, 1961 and on April 30, 1962 for current and reasonably foreseeable future needs were $2,431,145.53 as of April 30, 1961 and $2,868,907.00 as of April 30, 1962. See Schedule C.

## Schedule C

| | April 30, 1961 | April 30, 1962 |
|---|---|---|
| Total Assets | $6,671,677.77 | $6,611,773.00 |
| Liabilities | $1,808,499.40 a | $888,652.00 |
| Less notes transferred to original capital | 175,000.00 | —c |
| | 1,633,499.40 | 888,652.00 |
| | $5,038,178.37 | $5,723,121.00 |
| Less original capital: common stock | 74,500.00 | |
| notes (see above) | 175,000.00 b | 249,500.00 c |
| | 249,500.00 | 249,500.00 c |
| Total accumulated earnings and profits | $4,788,678.37 | $5,473,621.00 |
| Net fixed assets after depreciation | $2,607,032.84 | $2,854,214.00 |
| Less original capital invested in fixed assets b | 249,500.00 | 249,500.00 |
| | $2,357,532.84 | $2,604,714.00 |
| Amount of accumulated earnings and profits as of April 30 not invested in fixed assets | $4,788,678.37 | $5,473,621.00 |
| | 2,357,532.84 | 2,604,714.00 |
| | $2,431,145.53 | $2,868,907.00 |

a. The government erroneously contends that this figure should be reduced by $98,633.83, the amount of a reserve for "product adjustment", really a reserve for a liability on a claim of the government for defective tires, the amount of which was known on April 30, 1961, and which was paid shortly thereafter.

b. Taxpayer's original capital was represented by $74,500 common stock and $200,000 subordinated notes; $25,000 of those notes were paid off during the years 1945–1961. The stock and notes were issued for current and fixed assets of the former sole proprietorship; the ratio between current and fixed assets has not been proved. The Court has therefore given the government the benefit of the unreasonable assumption that the entire original capital was invested in fixed assets and remained in fixed assets undepreciated.

c. During the 1962 recapitalization, the subordinated notes ($175,000) and the original common stock ($74,500) were exchanged for new common stock ($249,500).

**(B)**

*(1) Amount of working capital reasonably needed for current operations immediately following each taxable year in question.*

Courts have found it difficult if not impossible to work out a satisfactory formula for determining current working capital requirements in section 531 cases. The reason for this difficulty was tersely stated by Judge Sobeloff in Smoot Sand & Gravel Corp. v. Commissioner, 241 F.2d 197, 207 (4 Cir. 1957), cert. den., 354 U.S. 922, 77 S.Ct. 1383, 1 L.Ed. 2d 1437 (1957):

> " * * * Working capital needs of businesses vary, being dependent upon the nature of the business, its credit policies, the amounts of inventories and rate of turnover, the amount of accounts receivable and the collection rate thereof, the availability of credit to the business, and similar relevant factors."

For a time the Tax Court "consistently held that the accumulation of funds to meet operation expenses for at least one year is reasonable". F. E. Watkins Motor Co., 31 T.C. 288, 299, n. 7 (1958); J. L. Goodman Furniture Co., 11 T.C. 530, 535 (1948).

In 1965 the Tax Court developed an "operating cycle" formula. Bardahl Mfg. Corp., 24 T.C.M. 1030 (1965). In that case the court determined petitioner's need for working capital by computing the amount of cash reasonably expected to be sufficient to cover its operating costs for a single operating cycle. Such a cycle consists of the period of time required to convert cash into raw materials, raw materials into an inventory of marketable products, the inventory into sales and accounts receivable, and the period of time required to collect its outstanding accounts. The Tax Court has recognized that the formula should

be subject to modification to meet the special circumstances of particular cases. Bardahl Int'l Corp., 25 T.C.M. 939, 944 (1966).

In Apollo Industries, Inc. v. C. I. R., 358 F.2d 867 (1 Cir. 1966), the First Circuit said that its analysis was "similar to that followed in Bardahl Mfg. Corp." [12] It disagreed with the analysis of the Tax Court (which had not followed the *Bardahl* approach in the *Apollo* case) and said: "We therefore pursue the approach used in *Bardahl,* not to sanctify it as applicable to all cases, nor to substitute our own determination of working capital needs for that of the Tax Court, but to test the reasonableness of the findings below." 358 F.2d at 872.

In the present case, taxpayer called as an expert witness Robert G. Koeppel, the resident partner of Haskins & Sells, who used a modified version of the *Bardahl* formula to develop taxpayer's anticipated working capital requirements for fiscal year 1962 as of April 30, 1961, and for fiscal year 1963 as of April 30, 1962. He used the average for each current year plus the two previous years in making his inventory and accounts receivable calculations. He concluded that the operating cycle requirement at the end of fiscal 1961 was $2,329,418, and at the end of fiscal 1962 was $2,607,233.[13] Koeppel concluded, however, that with respect to each of those years, the operating cycle requirement should be increased by the amount required to carry the maximum investment in accounts receivable and inventory in excess of the yearly average during the year under consideration. This resulted in adding $609,810 to the operating cycle requirement at the end of fiscal 1961, making the working capital requirements at the end of that fiscal year, as calculated by Koeppel, $2,939,228. The corresponding addition for fiscal 1962 was $598,933, making the working capital requirements at the end

---

12. The Court noted that no specific reason had been suggested why such an approach is not appropriate, government counsel having stated merely that it failed to take into consideration all the relevant factors.

13. The figures used by Koeppel would not have been greatly changed if the averages for one year rather than three years had been used in each instance.

of that fiscal year, as calculated by Koeppel, $3,206,156.

To meet those working capital requirements, Koeppel testified that taxpayer should be considered to have had available its net current assets, which, he testified, were generally considered by accountants to be a company's working capital. Taxpayer's current assets as of April 30, 1961 were $3,899,344 and its current liabilities, including state and federal income taxes, were $1,630,389. So, its net current assets or working capital on April 30, 1961 amounted to $2,268,945. The corresponding figures for April 30, 1962 were current assets, $3,575,559, current liabilities, $888,652, and net current assets or working capital, $2,686,907. Accordingly, Koeppel felt that at the end of each year there was a shortage of working capital to meet working capital requirements (as he calculated them) for the succeeding fiscal year.

If the operating cycle formula adopted by Koeppel had been used without the addition to meet the peak requirements, there would have been, according to Koeppel, a shortage of working capital to meet current needs as of April 30, 1961, in the amount of $60,473, but an excess of working capital to meet current needs as of April 30, 1962, in the amount of $79,684.

The government called as an expert Professor Victor Andrews of the Harvard Business School. He disagreed basically with the *Bardahl* approach and the approach taken by the First Circuit in *Apollo*, as well as Koeppel's approach. His principal point was that all three of those approaches ignored the cycle of current liabilities, and that as a consequence they overstated the need for working capital by assuming that all current liabilities should be considered as being payable out of existing current assets.

Andrews calculated his operating expenses on the basis of the year-end fig-

ures for both inventory and accounts receivable. This produced what he called "cost flows (excluding depreciation) during operating cycle", in other words, an "operating cycle requirement" which he calculated for the year ending April 30, 1961, to be $3,017,789 and for the year ending April 30, 1962, to be $2,056,808. Andrews then subtracted the year-end current liabilities from the cost flow or operating cycle requirement and stated that in his opinion the remainder, $1,532,124 at the end of fiscal 1961, and $1,159,380 at the end of fiscal 1962 represented the net current assets needed for current operations.[14]

In support of Professor Andrews' low estimate, the government argues that taxpayer might have borrowed money for current operations. The Courts, however, have generally considered a taxpayer's historic policy to finance current operations and expansions with its own funds, and have not penalized a taxpayer whose experience and bona fide policy justified self-financing. Mohawk Paper Mills, Inc. v. United States, 262 F.Supp. 365, 371–372 (N.D.N.Y. 1966); Duke Laboratories, Inc. v. United States, 222 F.Supp. 400, 412 (D.Conn. 1963), affirmed, 337 F.2d 280 (2 Cir. 1964). In the instant case taxpayer's history of recurring problems, as found above, justified its policy of self-financing.

The Court does not believe that the law requires it to accept any one of the three calculations, and the Court does not find that any one of them is conclusive, although each of them indicates particular facets of the problem which should be considered. In making its analysis and findings the Court has been guided by the following principles, as well as those quoted from the *Smoot Sand & Gravel* opinions, supra.

"* * * The search must always be concerned with the needs of the particular business as they existed during the particular year." Dixie, Inc. v.

---

14. It is apparent that Andrews' figures contemplated that the Company would keep one step ahead of the sheriff if everything went right; they would result in prompt insolvency if anything went wrong.

C. I. R., 277 F.2d 526, 528 (2 Cir. 1960).

"* * * The question does not lend itself to punch card solution since every stencil is different. Each business has its own history, its own problems and managerial policies." Sears Oil Co. v. C. I. R., 359 F.2d 191, 193 (2 Cir. 1966).

"While, as suggested above, the question of reasonable needs of a business primarily involves consideration of objective factors, these are not generally of such absoluteness on their face as to make the answer to the question a matter of law. * * * Practical evaluation of the whole situation involves an exercised, proper business judgment—but with that judgment being entitled to have as part of its background the realities which have prompted the statute, and not being required to be exercised on the basis of the plenariness within which management otherwise has the right to have its actions unquestioned." Kerr-Cochran, Inc. v. C. I. R., 253 F.2d 121, 124 (8 Cir. 1958).

"We do not think that a summary view of the balance sheet, or of working capital, or even of the amount of net liquid assets can give a court enough of an appreciation of the real needs of a business for operating funds. Business decisions are not made on the basis of information collected at arbitrary dates. They take into account the timing of needs and availability of resources. And so should judicial attempts to deal justly with these decisions. * * *" Apollo Industries, Inc. v. C. I. R., 358 F.2d 867, 871 (1 Cir. 1966).

All factors considered, the Court finds that the amount of working capital taxpayer reasonably needed for current operations as of April 30, 1961 was $2,250,-000. The similar needs as of April 30, 1962 were $2,000,000.

*(2) Future Needs.*

As we have seen, the term "reasonable needs of the business" includes the reasonably anticipated needs of the business. Section 537, supra. The Committee Reports [15] state that section 537

"will make clear that there is no requirement that the accumulated earnings and profits be invested immediately in the business so long as there is an indication that future needs of the business require such accumulations. In any case where there exists a definite plan for the investment of earnings and profits such corporation need not necessarily consummate these plans in a relatively short period after the close of the taxable year."

The Treasury Relations on Income Tax, 1954 Code, section 1.537–1(b) require that the corporation "have specific, definite and feasible plans for the use of such accumulation". Such needs may not be merely "subsequently declared intentions" or an "afterthought" to justify challenged accumulations of surplus. Smoot Sand & Gravel Corp. v. C. I. R., 241 F.2d at 202; KOMA, Inc. v. C. I. R., 189 F.2d 390 (10 Cir. 1951). To do "nothing but recognize a future problem and discuss possible and alternative solutions" is not sufficient. "Definiteness of plan coupled with action taken toward its consummation are essentials." Dixie, Inc. v. C. I. R., 277 F.2d 526, 528 (2 Cir. 1960); Fenco, Inc. v. United States, supra, 234 F.Supp. pp. 323–324.

"* * * Courts, however, must not blind themselves to the realities in this age of rapid technological change. The product of today is frequently outmoded tomorrow. The results of research in the electronics, pharmaceutical and chemical fields alone justify this statement. Nor is it always possible for a company in advance to set aside a specific sum to achieve a specific goal. Comments

15. H.Rep.No.1337, 83d Cong., 2d Sess., p. 53, p. A173 (3 U.S.C. Cong. & Adm. News, pp. 4311–4312); S.Rep.No.1622, 83d Cong., 2d Sess., p. 69, p. 318 (3 U. S.C.Cong. & Adm.News, p. 4958).

made in the past to the effect that a definite plan actually followed through must be on the company's books and records before moneys assigned thereto become anticipated needs may have to be appropriately qualified in particular cases." Electric Regulator Corp. v. C. I. R., 336 F.2d 339, 345–346 (2 Cir. 1964).

■ Whether a taxpayer's earnings and profits were permitted to accumulate beyond the reasonable needs of the business, including the reasonably anticipated needs of the business, cannot be determined solely on the testimony of its directors. However, their justification for the accumulation should be given serious consideration if it is credible and supported by the surrounding circumstances. See Kerr-Cochran, Inc. v. C. I. R., supra, 253 F.2d at 124.

Taxpayer seeks to prove the following items of future need to help justify the accumulation of earnings at issue herein:

1. Reasonably anticipated expenses for plant expansion. The testing center, including the dynamometer, was under construction at the end of fiscal 1961. Taxpayer spent $250,367 on the testing center and $397,255 for other plant expansion and equipment during fiscal 1962. The Court finds that $500,000 for these purposes was a reasonably foreseeable need as of April 30, 1961.

During fiscal 1963, $323,251 was actually spent on plant expansion and equipment. The Court finds that $300,000 for this purpose was a reasonably foreseeable need as of April 30, 1962.[16]

2. Renegotiation. This was a constant threat, usually resulting in a reduction of profits on government business to about 15%. It had cost taxpayer $90,670 in fiscal 1961, and it actually cost taxpayer $61,534 in fiscal 1962. An anticipated need of $60,000 as of April 30, 1961 should be recognized. Taxpayer does not claim any such need as of April 30, 1962.

3. Purchase of a wheel company or other business. As found above, taxpayer's directors had considered the possible acquisition of a number of companies even before 1961, because it feared that missiles might replace many military airplanes. In fiscal 1961 the change in the government's procurement policy for aircraft tires, detailed above, made it appear probable that taxpayer would lose all or part of this major line of business. The effects of the change of the procurement policy began to be felt by taxpayer in fiscal 1962 and severely reduced taxpayer's profits in fiscal 1963. By April 1962 it was imperative that taxpayer develop one or more other lines. Such development necessarily required either extensive building or remodeling of taxpayer's plant, or the acquisition of an existing business. It soon became apparent that the most promising new line would be a "package" of wheel and tire for various industrial uses. Taxpayer had done business with Jackson Manufacturing Company of Harrisburg, Pennsylvania, and during fiscal 1961 and 1962 serious discussions of the purchase of Jackson by taxpayer were held. On somewhat conflicting evidence, but on the weight of the most credible evidence, the Court finds that Jackson's management was not interested in a merger, but only in a sale for cash; that taxpayer desired to purchase Jackson for cash, but boggled at paying book value because Jackson's earnings were going down in 1961. Formal negotiations were necessarily suspended during the period of the secondary stock offering, but taxpayer's interest continued, and after Jackson's earn-

16. The government argues that taxpayer should not be allowed any credit for reasonably foreseeable needs for plant expansion and equipment except in excess of the amount of depreciation which would be claimed for the following year. This argument overlooks at least two facts: first, that plant and equipment has to be paid for in cash, while depreciation results only in tax savings of about 50¢ on each $1 of depreciation allowed; second, that the purpose of depreciation is to renew obsolete plant and equipment, and the costs of such renewal are steadily increasing.

ings took a turn for the better in the latter part of fiscal 1962, taxpayer resumed formal negotiations. A purchase of all the Jackson Company stock for $2,378,937 cash was finally consummated in 1964. Taxpayer borrowed $900,000 from the bank, and paid the rest from its own cash. Other businesses have since been acquired by taxpayer.

■ The tests for acquiring a business are not so strict as for buying new equipment or building an addition to a plant. In Freedom Newspapers, Inc., 24 T.C.M., at p. 1336 (1965), the Tax Court, considering the acquisition of other newspapers by the taxpayer, noted:

"* * * These problems are in a sense unique. A newspaper in no way resembles a fungible commodity. A prospective customer cannot merely place an order or draw plans, as for a piece of machinery or additional construction. He can do no more than actively search out opportunities for acquisition, either personally or through brokers. However, there is no assurance that his investigation and negotiation will culminate in an acquisition of any particular newspaper in any particular month or year.

"* * * *

"In view of the foregoing, we cannot rule that petitioner's expansion plans lacked definition and certainty *merely* because petitioner neither purchased any newspapers during the two years in issue nor had any written, as opposed to oral, offers of purchase outstanding at the close of either year."

The Court concludes that by April 1962, when the drastic effects of the government's new procurement policy began to be felt, taxpayer had an evident need for cash to acquire or establish a wheel business in the near future; taxpayer should be considered to have had by April 30, 1962 a reasonably anticipated future need of at least $1,000,000 for that purpose.

4. Funding of pension plans. It would have taken $630,256 to fund such plans at the end of fiscal 1961 and $566,753 to fund them at the end of fiscal 1962. These amounts were not included as liabilities in the respective balance sheets. Taxpayer intended to take care of this item bit by bit out of future profits. No immediate funding was contemplated, and no need to pay this item out of accumulated earnings and profits has been shown.

5, 6, 7. Taxpayer's claimed needs based on (5) an anticipated loss on doubtful accounts, (6) investments and loans, and (7) possible condemnation and relocation of its plant, do not meet the applicable tests.

■ The government contends that all of the claimed future needs should be considered as ones which would be taken care of out of future profits. The Court recognizes that some account should be taken of the availability of future earnings to meet legitimate needs. World Pub. Co. v. United States, 169 F.2d 186, 189 (10 Cir. 1948); Barrow Manufacturing Co. v. C. I. R., 294 F.2d 79, 82 (5 Cir. 1961). The Court has rejected the claimed need for certain items on this ground. The facts do not support the government's contention that all of taxpayer's reasonably anticipated future needs could be paid out of future earnings.[17] Particularly, taxpayer should not be required, as of April 1961 and 1962, to have looked to future earnings to take care of the three reasonably anticipated future needs (1, 2 and 3) recognized above.

■ Accordingly, the Court finds that the reasonably anticipated future needs as of April 30, 1961 were $560,000. Add-

17. The evidence shows that taxpayer would not have been able to purchase Jackson at the agreed price had the accumulations challenged herein not been made, even assuming (a) that taxpayer drew down the entire $1,300,000 loan available from the bank; (b) that taxpayer used all of its net income after taxes for fiscal 1963 and 1964; (c) that taxpayer needed no working capital at all in fiscal 1965; (d) and that taxpayer paid its current liabilities for the fiscal year ending April 30, 1964. This analysis is suggested by Electric Regulator v. C.I.R., supra, at 336 F.2d at 344–345.

ing this figure to the need for current working capital as of that date, $2,250,000, gives the sum of $2,810,000 as "the reasonable needs of the business" as of April 30, 1961. Since this figure exceeds the accumulated earnings and profits not invested in fixed assets as of that date, namely, $2,431,145.53 (see Schedule C), there had been no accumulation of earnings and profits in excess of needs. No section 531 tax could properly have been assessed for the taxable year ending April 30, 1961.

The corresponding figures as of April 30, 1962 are: future needs, $1,300,000; current needs, $2,000,000; total needs, $3,300,000. Accumulated earnings and profits not invested in fixed assets were $2,868,907 as of that date. Therefore, no section 531 tax could have been properly assessed for the taxable year ended April 30, 1962. The Court further finds that none of the accumulated earnings and profits were accumulated or used for any of the purposes which the applicable regulation, 26 C.F.R. § 1.537–2 (c), lists as indicative that earnings and profits are being accumulated beyond the reasonable needs of the business.[18]

## II.

If, contrary to the findings and conclusions in section I of this opinion, the evidence had shown that some earnings and profits had been accumulated beyond the reasonable needs of the business, plaintiff would have had to prove that those accumulations had not been made for the purpose of avoiding the income tax on the shareholders.

The law is still unsettled whether, in order to meet that burden, a taxpayer must prove (a) that tax avoidance was not the primary or dominant purpose for the accumulation, Donruss Co. v. United States, 384 F.2d 292 (6 Cir. 1967); Young Motor Co. v. C. I. R., 281 F.2d 488 (1 Cir. 1960); or (b) that tax avoidance was not a determinating purpose for the accumulation, Barrow Manufacturing Co. v. C. I. R., 294 F.2d 19 (5 Cir. 1961); Trico Products Co. v. C. I. R., 137 F.2d 424 (2 Cir. 1943). See discussion in Fenco, Inc. v. United States, supra, 234 F.Supp. 317, at 326, affirmed per curiam, 348 F.2d 456. The Supreme Court has granted certiorari, 390 U.S. 1023, 88 S.Ct. 1406, 20 L.Ed.2d 280 to review the decision in Donruss v. United States, supra, apparently because of the conflict between the Circuits on this question.

With Wright, Dankmeyer and Wooden on the Board of Directors, and with evidence in the case of the sophisticated manner in which the secondary offering of stock was handled, it is incredible that the directors were not aware of the tax consequences of their acts.

But the law does not require that directors be either ostriches or perjurers, nor should a corporation be required to place in its minute book reasons for not declaring dividends, although a contemporary recording of the true reasons may be helpful. In this case, no reasons were stated in the minutes. Some of the testimony offered by taxpayer was not persuasive; but the Court was impressed by the testimony of Wooden, a veteran and respected member of the accounting

18. Treasury Regulations on Income Tax (1954 Code), 26 C.F.R. § 1.537–2(c) lists the following purposes as indicative that earnings and profits are being accumulated beyond the reasonable needs of the business:

"(1) Loans to shareholders, or the expenditure of funds of the corporation for the personal benefit of the shareholders;

"(2) Loans having no reasonable relation to the conduct of the business made to relatives or friends of shareholders, or to other persons;

"(3) Loans to another corporation, the business of which is not that of the taxpayer corporation, if the capital stock of such other corporation is owned, directly or indirectly, by the shareholder or shareholders of the taxpayer corporation and such shareholder or shareholders are in control of both corporations;

"(4) Investments in properties, or securities which are unrelated to the activities of the business of the taxpayer corporation; or

"(5) Retention of earnings and profits to provide against unrealistic hazards."

profession, who testified that "it never occurred to me, with all of the obligations and needs and problems, that we were in danger of 531. That was the last thing I would have thought of." [19]

The Court need not resolve in this case the legal question of what test should be applied. That will probably be done by the Supreme Court sometime next year. The Court finds as a fact that the purpose of avoiding the imposition of the income tax on taxpayer's shareholders was not the primary or dominant purpose, nor a determinating purpose for the accumulations in question, although it was a factor considered by the directors. If, but only if, the findings and conclusions of this Court in section I of this opinion should be upset on appeal, the proper legal test, as it will be authoritatively determined by the Supreme Court, may be applied to the finding which has just been made.

Based upon the findings and conclusions in section I of this opinion, plaintiff is entitled to recover the full amount claimed. Counsel should agree upon a proper judgment order.

---

19. It should be noted that Dankmeyer did not take the stand.